Filed 5/16/23  P. v. Flores CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079468 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN374425) |
| ROBERTO IGNACIO FLORES, | |
| Defendant and Appellant. | |

APPEAL from judgments of the Superior Court of San Diego County, Carlos O. Armour and Harry M. Elias, Judges.  Reversed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.


In June 2017, Roberto Ignacio Flores intentionally drove his car into a police officer, causing serious life-threatening injuries.  Flores was convicted

by a jury of attempted murder, assault with a deadly weapon on a peace officer, and causing great bodily injury. In a separate trial, another jury found Flores guilty of manufacturing an assault weapon and being a felon in possession of a firearm.

Flores appealed and obtained a reversal of the conviction based on this court's determination that he had been deprived of his Sixth Amendment rights under *McCoy v. Louisiana* (2018) 584 U.S. __, 138 S.Ct. 1500 (*McCoy*). Specifically, we held that Flores's rights were violated by the decision of his appointed trial counsel, John Wilschke, to concede—over Flores's repeated objections—that Flores was the driver of the car that struck the officer and that the gun at issue in the second case belonged to him. (*Ibid.*)

After this court's reversal, the trial court again appointed Wilschke to represented Flores. Flores objected, *repeatedly*, to this choice of counsel, asserting that he had an irreconcilable conflict with Wilschke based on Wilschke's violation of his rights during the first trial. At one early point in the remanded case, Flores was given self-represented status to avoid Wilschke's representation. The court then revoked Flores's self-representation and reappointed Wilschke over Flores's continued objection.

On appeal, Flores's appointed appellate counsel makes three arguments. She asserts the trial court erred by revoking Flores's status as a self-represented defendant, by allowing into evidence incriminating statements Flores made to an undercover police officer and confidential informant in jail, and that resentencing in light of recent changes to Penal Code section 1170[1] is required. During the pendency of this appeal, Flores filed a petition for writ of habeas corpus raising several additional alleged errors in the trial proceedings after remand. Among other claims, Flores

---

[1]     Subsequent undesignated statutory references are to the Penal Code.

2

asserted his right to effective assistance of counsel was violated by the reappointment of Wilschke and by the failure of his appellate counsel, Athena Shudde, to raise this argument on appeal. As a result, we asked for supplemental briefing from the parties on the issue of Wilschke's continued representation of Flores after our prior reversal.

As we shall explain, we agree with Flores that the trial court's decision to reappoint Wilschke to represent him was an abuse of the court's discretion and requires the reversal of his conviction for a second time. In order to provide guidance to the trial court after this reversal, we also conclude that the court's decision to admit into evidence Flores's statements to the undercover police officer and confidential informant was not error.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Underlying Facts*

In March 2017, Flores lived with his pregnant girlfriend, Elizabeth B., and her family at their home in Vista. While Elizabeth and Flores were at the hospital for the delivery of their child, Elizabeth's sister, Hilary B., was cleaning out her old bedroom for the new baby's nursery. While she was cleaning, Hilary found a gun, body armor, a toolbox, and a hacksaw in the future nursery.

Hilary called 911, and police were at the house when Flores and Elizabeth arrived home from the hospital with their new baby. Flores was arrested. During a search of the home, police found the gun, which was an unmarked AR-15-style gun that was created without a serial number, known

---

[2]     Because we reverse the convictions on the basis of the trial court's decision to reappoint Wilschke as Flores's legal counsel, it is unnecessary for us to assess Flores's arguments that the trial court prejudicially erred by terminating his self-represented status and that he is entitled to resentencing under recent changes to the sentencing laws.

as a ghost gun.  Hilary recognized the gun as one Flores built in her family's backyard.  A sheriff criminalist in the County's firearms analysis unit concluded the gun was an illegal assault weapon under California law.

After his arrest, Flores called Elizabeth from jail several times.  In the recorded calls, he asked Elizabeth to tell the authorities that the gun and other contraband were hers.  He also told her he was angry about his arrest.  In one call, Flores said he wanted to press charges against the sheriff's deputies that arrested him, and asked Elizabeth to find out who they were.  In another, Flores said the arrest had ruined whatever love he had in his heart and that the deputies had mocked him during the arrest.  Flores was released from custody shortly thereafter.

In June 2017, Oceanside police officer Brad Hunter pulled over a car on Foussat Road for a traffic violation.  As the driver was rummaging to find his driver's license, he heard the scraping sound of metal and felt an impact on the driver's side of his car.  The driver looked up and witnessed Hunter "coming off" the roof of the car that struck his, somersaulting through the air, bouncing off a parked car in front of him, and landing on the ground in the fetal position.  The driver jumped out of his car, dialed 911, and went to Hunter.  The driver saw the car that hit Hunter speed away, run a stop sign, and make a sharp left turn on Industry Street, cutting off another car in the process.

Another driver in the area and her passenger also witnessed the collision.  The passenger saw Flores's small sedan, which was directly in front of the car she was in, enter the intersection near where Hunter stood and rapidly accelerate towards Hunter.  She then saw Flores's car hit Hunter and send him flying what she estimated to be 30 feet.

Another bystander in a truck in the area saw Hunter on the ground and followed Flores's car, a Dodge Neon. The bystander found the car parked on Industry Street and saw Flores running towards the nearby train station. The bystander saw Flores throw something into a ditch and also noticed the windshield of Flores's car was smashed. The bystander followed Flores to the train station and called 911.

At the same time, responding officers obtained a description of Flores from witnesses, which was dispatched to police. An Oceanside officer responding to that bulletin saw Flores at the train station and ordered him on the ground. When Flores refused the command, the officer grabbed Flores and placed him under arrest. Flores's eyes were bloodshot and he smelled of alcohol. Investigators later recovered a beer can from the ditch where the bystander saw Flores throw something.

Flores was transported to the police station. A blood draw showed methamphetamine in his system. Hunter was transported by ambulance to the airport and taken by helicopter to the hospital. He sustained severe injuries, including leg and spine fractures and a head injury, and was hospitalized for two weeks. At the time of the second trial, Hunter's injuries still prevented him from returning to work.

At the police station, after Flores invoked his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), he was placed in a jail cell with an undercover sheriff's deputy and a confidential informant. The deputy asked Flores, "What's up man?" and he responded by asking what the two agents were in for. The deputy responded they "got in a fucking pursuit" and asked Flores what he was in for. Without hesitation, Flores said he murdered a police officer and admitted he was the driver of the car that hit Hunter. Flores also said he viewed the police as his enemy, and that he wasn't sure if

5

he had previously encountered the cop he hit, but that it didn't matter. He told the deputy and informant that the only way to fight the police was to "kill 'em, one by one, or all by one."

When Flores's car was recovered, it had front end damage and a shattered windshield. In addition, there was damage on the passenger side door and mirror, damage to the hood, and an indentation on the roof. Hunter's handheld radio was embedded in the windshield. Inside the car were multiple empty beer cans and bottles.

An accident reconstructionist hired by the prosecution to examine the evidence estimated that Flores's car was traveling at 18 miles per hour when it struck Hunter. The reconstructionist determined that Flores drove his car towards the one that Hunter had pulled over, sideswiped the car, and then hit Hunter while accelerating. Hunter flew onto the hood of Flores's car, into the windshield, onto and over the roof, falling off the car on its passenger's side, and landing 60 feet from where he was struck. The reconstructionist testified the incident would likely have been fatal had Hunter, who was working as a motorcycle patrol officer, not been wearing a helmet at the time. He also testified that a reasonable driver had ample room to avoid hitting Hunter and that in his opinion the evidence showed Flores intentionally struck Hunter.

B. *Prior Trial and Appeal*

Flores's first trial took place at the end of 2017. A jury found him guilty of willful, premeditated, and deliberate attempted murder of a peace officer and assault with a deadly weapon upon a peace officer. In a separate second trial, he was convicted of manufacturing an assault weapon and being a felon in possession of a firearm. He was sentenced in both cases to 29 years to life in prison.

6

Flores appealed the convictions and we reversed the judgment, finding he had been deprived of his Sixth Amendment rights under *McCoy, supra*, 584 U.S. at p. __, [138 S.Ct. 1512]. (*People v. Flores* (2019) 34 Cal.App.5th 270, 273.) Specifically, we held that Flores's rights were violated by Wilschke's decision to concede, without Flores's approval, that he was the driver of the car that struck Hunter and that he was the owner of the ghost gun. (*Ibid.*)

C. *Present Trial*

Our prior opinion was filed on April 12, 2019. On June 17, 2019, at the first hearing in the trial court after we issued the remittitur, Flores immediately objected to Wilschke representing him again. Over Flores's objection, the trial court reappointed Wilschke and then allowed Flores to voice his concerns in a hearing outside the presence of the prosecution under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). At the hearing, Flores told the court he wanted a different attorney because Wilschke had violated his rights in the previous trial. The court, dissatisfied with this reason, asked Flores "to explain why you feel your attorney should be replaced." Flores provided no additional explanation and the court denied the request for the appointment of different counsel.

On July 9, 2019, Wilschke declared a doubt as to Flores's competency and the court suspended the proceedings in both cases. After a psychological examination, at a hearing on September 6, 2019, Flores was declared competent to stand trial and the criminal proceedings were reinstated. At a subsequent hearing on September 17, 2019, the trial court, the Honorable Blaine Bowman who served as the judge in the first trial, noted that the report of the psychiatrist that examined Flores contained multiple references

7

to Flores's desire to represent himself in the proceedings.[3] Wilschke confirmed that Flores had expressed the same to him, and Flores then confirmed he wanted to proceed without counsel.

The court then asked Flores to confirm his understanding of the risks associated with self-representation, placing special emphasis on the expectation that Flores "display proper courtroom decorum" and warning him that any disruptive behavior could cause the court to terminate his self-representation. The court then granted the request, but told Wilschke that, because of Flores's disruptive behavior in the first trial, he was to appear at all proceedings as standby counsel should Flores act inappropriately. Flores requested a four-month continuance to prepare for trial, which the court also granted, setting trial for February 18, 2020. Before the hearing concluded, Flores stated he wanted to challenge Judge Bowman and have the case reassigned. The court asked for briefing and set a hearing on the issue.

At a further hearing on October 2, 2019, this time before the Honorable K. Michael Kirkman, the court relieved Wilschke and the office of the public defender from any advisory responsibilities and set additional dates in the case. The court reminded Flores that he could request the appointment of counsel at any time and that as a self-represented litigant he was subject to the same procedural requirements as counsel.

Flores then filed three motions, including a motion to dismiss based on the violation of his due process rights. At a hearing before the Honorable

---

[3] In his report, the psychiatrist who examined Flores stated that Flores told him he had a conflict with Wilschke and that he preferred to represent himself because Wilschke "incriminated me in [the] last case which led to a bad outcome" and the case was "[r]eversed because of McCoy-6th amendment." Flores also told the psychiatrist that he wanted a different attorney but his request was denied, and that the judge told Flores he could either hire his own lawyer or represent himself.

Harry M. Elias, on January 10, 2020, Flores told the court the cases should be dismissed because "the courts are in collusion and conspiracy to violate my due process because the reason I'm back here for reversal was due to loss of counsel." The court denied the motion to dismiss and instructed Flores that his motion to exclude evidence of the undercover operation after his arrest would be heard before trial and that an evidentiary hearing would be provided.

Thereafter, Flores requested a continuance of the trial date, and the court entered a minute order on January 28, 2020 continuing the trial to September 28, 2020 over the prosecution's objection. The court conducted an evidentiary hearing on March 13, 2020 on Flores's motion to exclude the blood draw evidence showing methamphetamines in his system on the day of the assault. At the conclusion of the hearing, the court denied Flores's motion and confirmed the trial date.

The same day, the prosecution filed an amended information removing the prior prison term allegation and the Vehicle Code section 13351.5 allegation related to the attempted murder charge to conform to changes in the law that had occurred since the first trial. On May 14, 2020, at an arraignment hearing before Judge Elias over videoconference because of the newly-emerged Covid-19 pandemic, Flores objected to proceeding by videoconference, asserting he had a right to be arraigned in person. The court initially continued the hearing one week to allow Flores to "decide whether he wishes to continue on."

The court then stated that if Flores continued to take the position that he should be arraigned in person, it would reevaluate his self-represented status. Flores responded that he was "entitled to a public discharge" and refused to be arraigned. The court then found Flores was delaying

9

proceedings, revoked his pro per status, and ordered the Office of Appointed Counsel to appoint a lawyer.

A few days later, over Flores's continuing objection to appearing by video, the court arraigned Flores and reappointed Wilschke as his counsel. In August 2020, Wilschke filed a motion asking the court to reconsider Flores's pro per status.

At a hearing on September 11, 2020, Wilschke asserted that Flores objected to the video proceedings and continued to object to Wilschke's representation. The court, Judge Elias presiding, stated it could not consider reinstatement of Flores's pro per status if Flores objected to the proceedings, and found that Flores actions were "a further effort to delay the proceedings." Wilschke responded that objecting to the video proceedings was not pertinent to Flores's request to represent himself and was not an effort to delay, but a legitimate attempt to enforce his rights. At a pretrial hearing on September 30, 2020, Flores again objected to Wilschke's representation. Thereafter, the court continued the trial date, over Flores's objections, throughout the remainder of 2020 based on the court's pandemic emergency orders.

In January 2021, the case was assigned to the Honorable Carlos O. Armour for all purposes. At a pretrial hearing on February 24, 2021, Flores explained that he did not want to represent himself, but that he also did not want to be represented by Wilschke, who had infringed on his rights in the first trial. When asked by the court to state unequivocally if he wanted to represent himself, Flores said that Judge Elias took his right to represent himself away and he was left with an attorney he did not want at a "crucial moment" of the litigation. He refused to answer the question directly.

Wilschke also expressed frustration at the hearing, explaining that he was in a difficult position because Flores wanted a lawyer, but not Wilschke,

and that Flores was also "still, in essence, representing himself in a certain capacity." In addition, Wilschke stated that the motion he filed in August 2020 to reconsider relieving him as counsel and reinstating Flores's pro per status was still pending and he did not believe withdrawal of the motion was appropriate given Flores's conduct. The court ruled that Flores had not made the requisite unequivocal request to represent himself and confirmed that Wilschke remained Flores's defense counsel.

The trial was continued several more times as result of the pandemic. On June 28, 2021, Flores again requested new counsel and the court conducted a second *Marsden* hearing. Flores stated that he did not have an attorney-client relationship with Wilschke and that Wilschke had not discussed strategy or filed motions that Flores wanted to bring. Wilschke denied Flores's assertions. Wilschke stated they disagreed about when to file a speedy trial motion for dismissal, and that Wilschke believed it was more effective to wait to file the motion until they had a more reasonable expectation of going to trial.

Wilschke also addressed Flores's assertion that he had failed to discuss trial strategy with him, explaining he had consistently attempted to communicate with Flores, but that Flores thwarted those efforts, including by refusing to speak during in-person meetings. Wilschke emphasized that he was aware how critical Flores's participation in his defense was given the history of the case, but that Flores was unwilling to work with him. Wilschke stated, "Mr. Flores has refused at every instance to convey to me what strategy he wants to go forward with at the actual jury trial. And he is putting me in a challenging position as we get close to the trial as I have to prepare for trial to figure out what Mr. Flores wants me to do. Specifically, given the case history, it is my utmost goal to put forth whatever defense Mr.

11

Flores wants to do even if it may go against my experience and what I think may be legally the best defense for him."

The court then admonished Flores that he could not have it both ways, both refusing to work with Wilschke but then also claiming that Wilschke was not fit to represent him. The court ruled that at that "point in time [it] did not think there is a sufficient breakdown in the attorney-client relationship to have [it] remove the Public Defender's Office as your attorney of record." The court again reprimanded Flores to work with Wilschke, and told Flores the appellate court would need to know whether he had done that or not.

Flores responded, "I do not want to be appointed with an attorney that got me the reversal to begin with on appellate [sic] and that was him, the loss of the 6th Amendment, which was due to the *McCoy* or what you call a procedural error. So I don't know why the Court is still appointing somebody that's not looking for my best interest to begin with." The court responded that the *McCoy* decision was very new, and that a lot of judges were surprised by the decision and by the decision in Flores's case. The court stated that it "found no fault" in how Wilschke handled the first case, and, in essence, that this court's decision was incorrect. The court denied Flores's request for new counsel.

After pretrial proceedings, including the denial of Flores's speedy trial motions, the second trial began on July 28, 2021. During opening statements, the court moved Flores out of the courtroom into a holding cell because he was disrupting the proceedings.[4] Flores was able to hear the proceedings but could not see them or otherwise participate. On the third

---

[4]    The record does not explain what conduct by Flores resulted in his removal from the courtroom.

day of trial, Flores again requested a new attorney and the court conducted a third *Marsden* hearing. In response to the court's question, Flores said Wilschke had refused to object to the jurors being identified by numbers and not by their actual names. Flores then stated he would kill Wilschke if he did not win the case. The court explained that identification of the jurors by number was the court's standard practice, required by statute, and that their names were provided during voir dire. The court rejected Flores's assertion that the practice violated his rights.

After Flores's threat, Wilschke stated that Flores had never threatened him before, and that he did not fear Flores and could continue to represent him. Flores then objected to not being able to sit at the defense table during the trial, but when the court asked Flores if he could remain silent during the proceedings, Flores stated he could not refrain from speaking and that he needed to make objections. The court then stated Flores would continue to be seated in the holding cell next to the courtroom. The court again denied Flores's request for a different attorney.

The trial was completed with Flores remaining in the holding cell for the rest of the proceedings. After closing arguments, the jury found Flores guilty of willful, premeditated, and deliberate attempted murder of a peace officer (count 1, §§ 664/187, subd. (a)), 189, 664, subds. (e), (f)) and assault with a deadly weapon upon a peace officer (count 2, § 245, subd. (c)). The jury returned true findings on the allegation that Flores personally inflicted great bodily injury in the commission of the offenses under section 12022.7, subdivision (a), and that Flores committed the assault (count 2) using a vehicle as a deadly weapon under Vehicle Code section 13351.5. The jury also found Flores was on bail in the gun manufacturing case at the time of the offenses.

13

A separate trial on the gun charges took place immediately after the first trial. That jury found Flores guilty of manufacturing an assault weapon in violation of section 30600, subdivision (a) and of being a felon in possession of a firearm in violation of section 29800, subdivision (a)(1).

On September 7, 2021, Flores was sentenced in both cases to a total determinate term of 13 years, plus an indeterminate term of 15 years to life in state prison. The sentence is comprised of a 15-year-to-life term for the attempted murder conviction plus three years for the great bodily injury allegation, two years for the on-bail allegation related to the crimes against Hunter, and eight years for the manufacturing an assault weapon conviction. Flores timely appealed the judgments of conviction.

## DISCUSSION

Flores's initial opening brief challenges the court's decision in May 2020 to revoke his pro per status and the court's denial of his motion in limine to exclude the statements he made to the undercover sheriff's deputy and confidential informant in jail. Flores's opening brief also asserts, and the People concede, that recent changes in sentencing laws require remand for resentencing.

As noted, while the appeal was pending, Flores, proceeding in propria persona, filed a petition for writ of habeas corpus challenging various aspects of his conviction, including an assertion that Wilschke was biased against him and provided ineffective assistance of counsel as a result. Prompted by Flores's petition, we ordered the parties to brief the issue of whether the court erred by reappointing the same trial counsel who represented Flores in the first trial and again after the court revoked defendant's pro per status. Because this supplemental issue is dispositive of the case and requires reversal, we address it first.

14

# I

*Reappointment of Wilschke After Reversal*
*Was a Prejudicial Abuse of Discretion*

## A

*Legal Standard*

"A criminal defendant's right to counsel is guaranteed by both the federal Constitution's Sixth Amendment (applicable to the states through the Fourteenth Amendment), and by California Constitution article I, section 15. The essential aim 'is to guarantee "an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." ' " (*People v. Sapp* (2003) 31 Cal.4th 240, 256.) A defendant who does not require the appointment of counsel by the court, has the right "to choose who will represent him." (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144 (*Gonzalez-Lopez*).)

The right to choose counsel, however, does not extend to an indigent defendant like Flores. (*Gonzalez-Lopez, supra*, 548 U.S. at p. 151.) Under the Federal and State constitutions, criminal defendants have "the right to an attorney who must competently represent the defendant" but the law "does not give an indigent the right to *select* a court appointed attorney." (*People v. Jones* (2004) 33 Cal.4th 234, 244 (*Jones*); accord *People v. Noriega* (2010) 48 Cal.4th 517, 522–523.) California law requires the trial court to inform a defendant of his right to counsel and "assign" counsel to represent an indigent defendant who desires counsel. (§ 987, subd. (a); see *People v. Crayton* (2002) 28 Cal.4th 346, 361.)

The Sixth Amendment right to counsel does, however, guarantee indigent defendants conflict-free effective assistance of counsel. (See *Wheat v. United States* (1988) 486 U.S. 153, 162–163 [a defendant has the right to assistance of counsel free of actual conflicts]; *Strickland v.*

15

*Washington* (1984) 466 U.S. 668, 686.) To determine the existence of a disabling conflict, the court must acknowledge that a defendant's relationship with counsel "involves not just the casual assistance of a member of the bar, but an intimate process of consultation and planning which culminates in a state of trust and confidence between the client and his attorney. This is particularly essential, of course, when the attorney is defending the client's life or liberty." (*Smith v. Superior Court* (1968) 68 Cal.2d 547, 561 (*Smith*).)

The "relationship is independent of the source of compensation, for an attorney's responsibility is to the person he has undertaken to represent rather than to the individual or agency which pays for the service." (*Smith, supra*, 68 Cal.2d at pp. 561–562.) "It follows that once counsel is appointed to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained." (*Id.* at p. 562.) The Sixth Amendment does not require or guarantee that an attorney-client relationship be completely free of discord. (*Morris v. Slappy* (1983) 461 U.S. 1, 13–14.) Rather, for a conflict to rise to the level of a constitutional violation, there must be a complete breakdown of the attorney-client relationship. (*People v. Clark* (2011) 52 Cal.4th 856, 912 (*Clark*).)

Lack of trust in the attorney, alone, may not constitute an irreconcilable conflict. (*People v. Myles* (2012) 53 Cal.4th 1181, 1207 (*Myles*); *People v. Jones* (2003) 29 Cal.4th 1229, 1246.) Likewise, tactical disagreements may not, by themselves, constitute an irreconcilable conflict. (*People v. Roldan* (2005) 35 Cal.4th 646, 682 (*Roldan*); accord, *People v. Cole* (2004) 33 Cal.4th 1158, 1192 (*Cole*).) However, as occurred in Flores's first trial, an attorney may not deprive the defendant of certain fundamental

16

rights on which he has the final say.  (*People v. Robles* (1970) 2 Cal.3d 205, 214.)

As we previously held in this case, a disagreement about the defendant's personal right to control the narrative of the defense can create "intractable disagreements about the fundamental objective of the defendant's representation."  (*People v. Flores, supra*, 34 Cal.App.5th at p. 273, citing *McCoy, supra*, 584 U.S. at p. __, [138 S.Ct. at p. 1510].)  Hence, a tactical disagreement that involves the deprivation of a fundamental right, can " 'signal a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel.' "  (*People v. Williams* (1970) 2 Cal.3d 894, 905.)  Critically, " 'to compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.' "  (*People v. Stankewitz* (1982) 32 Cal.3d 80, 94 (*Stankewitz*), quoting *Brown v. Craven* (9th Cir. 1970) 424 F.2d 1166, 1170; see *Clark, supra*, 52 Cal.4th at p. 912 ["Substantial impairment of the right to counsel can occur when ... 'the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' "].)

Section 987.2 creates the process for appointment of counsel for indigent defendants in this state.  Subdivision (e) of the statute requires the San Diego Superior Court to "first utilize the service of the public defender to provide criminal defense services for indigent defendants" subject to availability and in the absence of a conflict of interest.  (*Williams v. Superior Court* (1996) 46 Cal.App.4th 320, 329; § 987.2, subd. (e).)  If the defendant believes appointed counsel cannot provide adequate representation and

17

indicates this to the court, the court must permit the defendant, in an in camera hearing outside the prosecutor's presence (known as a *Marsden* hearing), "to state the reasons why he believes that a court-appointed attorney should be discharged." (*People v. Lucky* (1988) 45 Cal.3d 259, 281– 282.)

" 'When a defendant seeks substitution of appointed counsel pursuant to *People v. Marsden, supra*, 2 Cal.3d 118, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' [Citation.] 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 230 (*Streeter*).)

" 'We review the denial of a *Marsden* motion for abuse of discretion.' [Citation.] 'Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." ' " (*Streeter, supra*, 54 Cal.4th at p. 230.) Likewise, "[t]he appointment of counsel for indigent defendants under section 987.2 rests within the sound discretion of the trial court." (*People v. Horton* (1995) 11 Cal.4th 1068, 1098.) Abuse of discretion is found when the court "acts unreasonably under the circumstances of the particular case." (*Cole, supra*, 33 Cal.4th at pp. 1184–1185.)

Put another way, a trial court's discretion "rest[s] upon consideration of the particular facts and interests involved in the case before it." (*People v.*

18

*Chavez* (1980) 26 Cal.3d 334, 346; *Cole, supra*, 33 Cal.4th at p. 1185.) To properly exercise discretion, the court must consider a defendant's right to counsel along with the court's interest in " ' "ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 996; *Gonzalez-Lopez, supra*, 548 U.S. at p. 152.)

If the trial court errs, the failure to appoint new counsel because of an irreconcilable conflict is reviewed under the harmless error standard applicable to the erroneous denial of a *Marsden* motion. Where there is *Marsden* error, this court "must reverse unless the record shows beyond a reasonable doubt that the defendant was not prejudiced." (*People v. Knight* (2015) 239 Cal.App.4th 1, 9.) The People have the burden to make this showing. (*People v. Reese* (2017) 2 Cal.5th 660, 671.)

B

We conclude the conflict between Wilschke and Flores deprived Flores of his right to the effective assistance of counsel in the second trial.

The People assert that "appointing attorney Wilschke at the initial hearing following the reversal on appeal was reasonable, as he was the attorney who was most familiar with the matter because he was the appellant's attorney at his first, albeit, unsuccessful trial." Further, they argue that because *McCoy* was issued after Wilschke's defense of Flores in the first trial, Wilschke's decision to override Flores's rights in the first trial did not impair his ability to represent Flores after remand. Finally, the People contend that Flores failed to "affirmatively demonstrate how Wilschke was providing inadequate representation, or [how] he and Wilschke were so embroiled in an irreconcilable conflict that ineffective representation was likely to result."

19

We disagree with the People's interpretation of the record, which we laid out in detail in the background section of this opinion. Instead, in our view, the record shows that immediately after reversal Flores made clear that Wilschke's decision to override his right to maintain his factual innocence, a violation of Flores's rights found by this higher court, created an irreconcilable conflict that prevented effective representation. From the very first hearing, Flores asserted that he could not work with Wilschke because he had violated his constitutional rights. Instead of accepting this position, the court asked for additional explanation. When Flores could not give further detail, the court denied his request.

Then, in another effort to avoid Wilschke's representation, Flores sought and was permitted to represent himself. Just a few months later, after the start of the pandemic, when Flores attempted to assert his right to be arraigned in person, the court revoked his self-represented status, and reappointed Wilschke, again over Flores's continued objection.

After the case was assigned to Judge Armour for all purposes, Flores continued voicing his objection to Wilschke and made clear that he did not want to represent himself, but instead wanted to be represented by different counsel who had not infringed his constitutional rights. At this juncture, Wilschke himself recognized the predicament, telling the court he was in a difficult position because Flores wanted to be represented by different counsel, and that Flores was also "still, in essence, representing himself in a certain capacity" because of Flores's unwillingness to work with him.

On June 28, 2021, at the second *Marsden* hearing, Flores again expressed his frustration and unwillingness to work with Wilschke because he lacked trust in him as a result of this court's reversal. Wilschke also stated that Flores was completely averse to working with him and explained

20

that he did not know what Flores wanted to do with respect to trial strategy, a particularly uncomfortable position given this court's prior decision. Rather than appoint new counsel, the court admonished Flores to work with Wilschke, stating in essence that *McCoy* and our prior decision were wrongly decided and that the court "found no fault" in Wilschke's handling of the first trial.

Finally, at the third *Marsden* hearing, in his final attempt to gain another attorney, Flores threatened Wilschke's life. The court, frustrated with what it viewed as disruption and delay, again rejected Flores's request and placed him back in a holding cell near the courtroom where he remained for the rest of the second trial.

This record shows escalating frustration on the part of both Flores and the trial court, and that no party to the dispute over whether Flores should be provided with new counsel was willing to bend. But it also shows clearly that Flores did not receive effective representation because he had a fundamental mistrust of Wilschke as a result of this court's prior decision. Rather than accept that this obvious conflict existed, the trial court repeatedly rejected Flores's concern. Consequently, at each turn, Flores's anger and frustration with the justice system increased.

The crime in the case is undoubtedly heinous, but Flores was entitled to counsel with whom he did not have an intractable conflict and fundamental mistrust based on the prior proceedings. In our view, on this unique record, the trial court's unwillingness to accommodate Flores's undaunting requests for a new lawyer fell outside the bounds of reason and constituted an abuse of discretion. The question of whether an indigent criminal defendant is entitled to different counsel encompasses the court's interest in " 'ensuring that criminal trials are conducted within the ethical

standards of the profession and that legal proceedings appear fair to all who observe them.' " (*Jones, supra*, 33 Cal.4th at p. 240.)  At a minimum, the court's refusal to recognize the conflict created by our prior opinion created the appearance of unfairness in this proceeding.

We disagree with the People's assertion that the initial reappointment of Wilschke was appropriate because *McCoy* was not the law of the land when the first trial took place.  Forcing a defendant to accept representation by a lawyer who was just found to have violated his constitutional rights is not within reason.  While it is unquestionably true that some benefit flowed from Wilschke's continued representation of Flores, particularly Wilschke's intimate knowledge of the case, such benefit does not negate the very obvious conflict created by Wilschke's decision in the first trial to override his client's desire to maintain his factual innocence.  Although many lawyers might have made the same tactical decision that Wilschke made in defending Flores, this fact did not invalidate Flores's understandable mistrust of his counsel thereafter.  (See *Stankewitz, supra*, 32 Cal.3d at p. 94 [" '[T]o compel one charged with [a] grievous crime to undergo trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.' "].)

We also are not persuaded by the People's assertion that there was no error because Flores failed to carry his burden to show "how not replacing his attorney would substantially impair his right to assistance of counsel."  The People assert, " '[if] a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law.' " (*Myles, supra*, 53

Cal.4th 1181, at p. 1207.) This is not the case before us. We are sensitive to the fact that Flores's behavior in the trial court was at times inexcusable and inappropriate, and thus his repeated requests for a different attorney were met with cynicism. However, Flores had a genuine reason for his mistrust of Wilschke, a reason he stated over and over again throughout the proceedings leading to his second trial and that arose directly from this court's prior reversal of his convictions. As Flores's supplemental brief asserts, "[u]nder the totality of the circumstances of this unique case, the trial court's [repeated] failure to appoint other counsel" was an abuse of discretion.

The cases cited by the People to support their argument that Flores failed to show an irreconcilable conflict are unlike the rare facts of this case. In *People v. Myles, supra*, 53 Cal.4th 1181, the defendant requested new counsel but in his *Marsden* hearing, "indicated his willingness to try to 'come to some type of understanding' with counsel," leading the court to "reasonably ... find that any asserted conflict between defendant and his attorney was not irreconcilable." (*Id.* at p. 1207.) Further, the request for new counsel was denied without prejudice, but the defendant did not renew his request. (*Ibid.*) As discussed, Flores was unswerving in his belief that Wilschke could not represent his interests in light of Wilschke's prior violation of his rights, and he voiced his concern at every turn.

In *Clark, supra*, 52 Cal.4th 856, the defendant asserted he could not communicate with his primary attorneys because they were women, but also "acknowledged he communicated easily with" one of his two appointed female public defenders. (*Id* at p. 910.) In addition, the trial court appointed a male attorney from outside the public defender's office (at the defendant's request) to assist the defendant with his *Marsden* motion and then later to facilitate communication between the defendant and the two female attorneys. (*Id.* at

pp. 915–916.) The trial court in *Clark* took extensive measures to ensure that the capital defendant received adequate representation. (See also *People v. Streeter, supra*, 54 Cal.4th at pp. 227–230 [denial of defendant's request to replace counsel after jury convicted him of first degree murder, but before the penalty phase, was not error where *Marsden* motion prepared with the assistance of independent appointed counsel was withdrawn and "[d]efendant told the court that after speaking with [trial counsel], his concerns had been resolved and he understood what [trial counsel] was doing."].) A far simpler intervention in the case, namely the appointment of a different lawyer, could have prevented this second reversal.[5]

---

[5] Several other cases cited by the People involve tactical disagreements between appointed counsel and defendants. We do not agree that these cases support affirmance. Unlike this case, none show a fundamental mistrust of counsel caused by the one-of-a-kind situation presented here, i.e. the attorney's violation of the defendant's rights in an earlier liability trial. (See, e.g., *People v. Jackson* (2009) 45 Cal.4th 662, 681–688 [after federal appeals court found ineffective assistance of counsel in penalty phase of capital case, the court appointed new counsel and a new penalty phase resulted in death penalty verdict; court rejected *Marsden* error claim where defendant failed to show counsel had not pursued defense strategy advanced by defendant]; and *People v. Smith* (1993) 6 Cal.4th 684, 696 [holding same standard for granting *Marsden* motion applies to request for substitute counsel before and after conviction; no error where defendant given ample opportunity to voice concerns about advice to accept a plea deal].)

Likewise, the cases cited by the People that reject a claim of *Marsden* error based solely on threats made by defendants against their counsel in an attempt to delay proceedings are inapposite to the unusual facts presented here. (See *People v. Johnson* (2018) 6 Cal.5th 541, 579 [defendant's physical assault of his attorney during jury selection did not create conflict requiring appointment of new counsel], and *Roldan, supra*, 35 Cal.4th at pp. 682–683 [trial court's conclusion that defendant's threats of violence towards his trial counsel was an effort to delay and did not create a conflict precluding counsel from representing the defendant was not error].)

Finally, we agree with Flores that the court's decision not to replace Wilschke was not harmless. While the weight of the evidence against Flores is substantial, we cannot say beyond a reasonable doubt that Flores was not prejudiced by the court's appointment of Wilschke over Flores's repeated objections. In particular, the nonexistence of their attorney-client relationship was a factor in the court's decision to place Flores in a holding cell during the trial, preventing him from observing or participating in the trial at all. Further, Wilschke himself told the court that he had no relationship with Flores and that on the eve of trial he did not know what defense strategy Flores wanted to pursue. Given these facts, we cannot say the result would have been the same in the absence of the error. (See *U.S. v. Gonzalez-Lopez* (2006) 548 U.S. 140,150 ["Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. ... It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings."]) Accordingly, reversal of Flores's convictions is again required.

## II

### *Admission of the Perkins Operation Evidence Was Not Error*

As discussed, Flores was the subject of a *Perkins* operation[6] in which he made incriminating statements to an undercover officer and a confidential informant in jail.  Although we conclude that Flores is entitled to a new trial with a different attorney, we reach this issue to avoid additional litigation in a potential third trial and hold that the evidence was properly admitted.

### A

Under the Fifth Amendment, no person shall be compelled in any criminal case to be a witness against himself.  In *Miranda*, the Supreme Court adopted "a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation." (*People v. Jackson* (2016) 1 Cal.5th 269, 339, internal citations omitted.)  Once a suspect invokes the right to remain silent or the right to counsel, "the interrogation must cease." (*Ibid.*)

"A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson, supra*, 1 Cal.5th at p. 339.)  When reviewing a trial court's ruling on a claimed *Miranda* violation, the court accepts the trial court's resolution of disputed facts and inferences, and its credibility evaluations if supported by substantial evidence.  The reviewing court will then independently determine from those facts whether the challenged statements were illegally obtained,

---

6     *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).  In a *Perkins* operation, an undercover operative, who the suspect does not know is a police agent, is placed in a cell with the suspect.  (*Id.* at p. 294.)

applying federal constitutional standards.  (*Ibid.*; accord, *People v. Elizalde* (2015) 61 Cal.4th 523, 530.)

However, "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda.*"  (*Perkins, supra*, 496 U.S. at p. 296.)  Rather, *Miranda* protects the Fifth Amendment rights of a suspect faced with the coercive combination of being in custody and subject to an interrogation believed to be official.  On the other hand, even if a suspect happens to be in custody, "[t]here is no empirical basis for the assumption that [when] speaking to those whom he assumes are not officers[, he] will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess."  (*Id.* at pp. 296-297; see also *People v. Williams* (1988) 44 Cal.3d 1127, 1141–1142 [the court has never applied *Miranda* to "conversations between an inmate and an undercover agent"].)

In *Perkins*, the defendant was in prison when he told a fellow inmate about a murder he committed.  The inmate reported the defendant's confession to authorities, but by that time the defendant had been released from prison and was in custody on an unrelated charge.  (*Illinois v. Perkins, supra*, 496 U.S. at p. 294.)  Police placed an undercover informant in the cellblock with the defendant, who elicited further incriminating statements.  (*Id.* at pp. 294–295.)  In allowing the admission of incriminating statements, the Supreme Court held that conversations between suspects and undercover agents did not implicate *Miranda*.  "The essential ingredients of a 'police dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone that he believes to be a fellow inmate....  [¶] It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation."  (*Id.* at pp. 296–297.)

27

*Miranda* does not "protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates." (*Id*.at p. 298.)

The California Supreme Court has repeatedly applied *Perkins* in upholding the admissibility of statements made by a defendant to a person the defendant does not suspect to be a government agent. (See, e.g., *People v. Fayed* (2020) 9 Cal.5th 147, 165 (*Fayed*); *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 284 [stating that although defendant "misplaced his trust in confiding in [an inmate acting as government agent], [defendant's] tape-recorded statements were voluntary and free of compulsion;" "the United States Supreme Court has rejected ' "the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent" ' "]; *People v. Tate* (2010) 49 Cal.4th 635, 686 ["Both 'custody' and 'police questioning' are necessary to invoke *Miranda*, and both concepts are viewed from the suspect's perspective."].)

Here, similar to the defendant in *Perkins*, Flores was placed in a cell with two individuals who were unknown to him—an undercover deputy and a confidential informant. He spoke to them freely under the belief that they were also in custody. There was no coercive, police-dominated atmosphere or official compulsion for him to speak. Accordingly, his *Miranda* rights were not violated. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 401 [" 'Absent "custodial interrogation," *Miranda* simply does not come into play.' "].)

Flores asserts that *Perkins* left open the question of whether an undercover officer could question a suspect who has already invoked his *Miranda* rights before making the incriminating statements. However, as Flores acknowledges, the courts of our state have rejected this argument.

28

The California courts have consistently held that *Miranda* does not require the suppression of a defendant's voluntary statements to a person who is assisting the police, even after a defendant has invoked his right to remain silent or to have the assistance of counsel, because such statements are not the product of custodial interrogation. (See, e.g., *Gonzales and Soliz, supra*, 52 Cal.4th at p. 284; *Tate, supra*, 49 Cal.4th at pp. 685–687; *People v. Thornton* (2007) 41 Cal.4th 391, 432–433; *People v. Mayfield* (1997) 14 Cal.4th 668, 758–759, disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2; *Williams, supra*, 44 Cal.3d at pp. 1141–1142.)

Here, even though Flores invoked his *Miranda* rights before speaking to the undercover agents, his statements did not implicate *Miranda* because he did not believe the agents were police officers. Thus, there was no "official compulsion" to speak. (*People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1541 [absent custodial interrogation, *Miranda* rights are not implicated].) Dialogue between jail inmates is not interrogation, even if one of them is secretly cooperating with the police. "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner. ... Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns." (*Perkins, supra*, 496 U.S. at p. 297.) Accordingly, we reject Flores's assertion that his invocation of his rights under *Miranda* brings his statements outside of *Perkins*.

B

Flores also argues that the admission of the statements violated his right to fundamental fairness under the Fourteenth Amendment. He relies on Justice Brennan's concurring opinion in *Perkins* that noted "the deception and manipulation" used on the defendant "raise a substantial claim that the

29

confession was obtained in violation of the Due Process Clause." (*Perkins, supra*, 496 U.S. at p. 301.)  Justice Brennan reasoned that someone in custody is more likely to confide in others or engage in " 'jailhouse bravado,' " while at the same time the "State is in a unique position to exploit this vulnerability." (*Id.* at pp. 302–303.)  Justice Brennan opined he would leave it "open to the lower court on remand to determine whether, under the totality of the circumstances, respondent's confession was elicited in a manner that violated the Due Process Clause." (*Id.* at p. 303.)

"State and federal constitutional principles prohibit a conviction based on an involuntary confession. [Citations.]  'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.]  In determining whether a confession was voluntary, " '[t]he question is whether defendant's choice to confess was not "essentially free" because his [or her] will was overborne.' "  [Citation.]' [Citation.]  ...  [¶] A confession's voluntariness depends upon the totality of the circumstances in which it was made." (*People v. Winbush* (2017) 2 Cal.5th 402, 452.)  "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.)

While it is possible that a person surreptitiously working as an agent of the government might engage in coercive threats that vitiate the voluntariness of a confession (see *Arizona v. Fulminante* (1991) 499 U.S. 279, 287 [coercion due to "credible threat of physical violence" if defendant did not confess]), a person secretly acting as a government agent does not engage in coercive or improper tactics merely by "coax[ing] and prodd[ing]" a defendant to speak.  (*Fayed, supra*, 9 Cal.5th at p. 166.)  It is only when the agent uses

improper tactics that overcome a defendant's will that it may be said that a defendant's confession is involuntary. (*Id.* at pp. 165–166 [stating that although informant was "much more than a passive listener," the confession was voluntary since "defendant was neither compelled into revealing his role in [victim's] murder, nor was he coerced into hiring a hitman to kill [second victim]"].)

No such conduct is found in this record. Flores does not point to any threats or promises of leniency made by the undercover sheriff's deputy or the confidential informant that could have overcome his will and led to his confession. Flores's argument that suppression of his statements is supported by the facts that he was in custody, and the "two government agents ... were much larger than [Flores] and outweighed him by at least 50 pounds," and that he was dressed in "nothing more than, in essence, a hospital gown," is not persuasive. There was nothing overtly coercive about this situation. Rather, a review of the entirety of the jailhouse conversation supports the conclusion that Flores spoke with the agents willingly and with minimal questioning or even speaking on their part. (See *Fayed, supra*, 9 Cal.5th at p. 166 ["If the ' "decision [to speak] is a product of the suspect's own balancing of competing considerations, the confession is voluntary" ' "].)

Nothing in the record demonstrates that any of the statements made by the undercover officer or the confidential information were of the type likely to produce an untrue statement. Accordingly, the trial court's admission of Flores's statements did not violate his Fourteenth Amendment right to due process.

## DISPOSITION

The judgments are reversed.

McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


BUCHANAN, J.